[Civ. No. 12778. First Dist., Div. One. June 21, 1945.]

ANNA J. BLACHE, Plaintiff and Appellant, v. MAURICE J. BLACHE, Respondent; JEANNE C. PEDEBIDOU, Defendant and Appellant.

David Livingston, Louis F. Di Resta, Max H. Margolis and Milton A. Krug for Plaintiff and Appellant.

Edward J. Lynch for Defendant and Appellant.

Fletcher A. Cutler for Respondent.

WARD, J.—Plaintiff, Anna J. Blache, brought this action for separate maintenance against Maurice J. Blache (sometimes referred to as Jean J. M. Blache) and Jeanne C. Pedebidou, also known as Jeanne Blache. As a matter of convenience the parties will be referred to as Anna, Maurice and Jeanne. They are the components of a marital triangle constructed by Maurice when he married Jeanne under the mistaken impression that he had secured a divorce from Anna. Maurice was relatively poor during his marriage to Anna, but, as appears from the present transcript, after marrying Jeanne, and with her help, he accumulated a substantial amount of real and personal property. Anna is now demanding separate maintenance and a share of the property which she claims is the community property of herself and Maurice. Jeanne is joined as a party defendant because Maurice transferred property to her. The trial court refused to grant Anna

separate maintenance but rendered a judgment in her favor for $7,989.13 in lieu of her rights in the community property and allowed her attorney's fees of $6,500.

Anna's first amended complaint alleges that she and Maurice intermarried in the State of Ohio in May of 1912, and that sometime in 1915 Maurice deserted and abandoned her; that for more than one year prior to filing the complaint he neglected to provide the common necessaries of life although Anna was an indigent person, and that for a long period of time Maurice and Jeanne have lived and cohabited together. The first amended complaint also alleges that Maurice was the owner of a certain business venture and of stocks, bonds, real estate, etc., constituting the community property of Anna and Maurice, and that Jeanne had no interest therein other than as a trustee. Anna, as plaintiff, prayed that her share of such community property be set apart for her, and also for separate maintenance, attorneys' fees, and that Jeanne should be debarred from asserting any claim adverse to plaintiff's interest.

Maurice answered alleging extreme cruelty on Anna's part; that she had deserted him in 1914; that for some years Anna and Maurice believed that a divorce had been granted dissolving their union; that during such period no request was made by Anna for maintenance or support notwithstanding that she knew seven years before filing the present complaint that there was in fact no divorce and that a marriage ceremony had been performed between Maurice and Jeanne. Maurice alleged acquiescence and condonation and that the conduct of Anna constituted laches. Maurice filed a cross-complaint for divorce on the ground of extreme cruelty and a further cross-complaint for annulment of the marriage based upon alleged fraud in obtaining the consent of Maurice to the marriage contract. The trial court denied both the divorce and the annulment, and Maurice has not appealed from the judgment.

Jeanne, without waiving her right to object to the jurisdiction of the court to try title to certain property, answered, claiming that the suit filed by Anna was barred by statutes of limitation. The answer in great measure followed the allegations of the answer of Maurice. In addition, Jeanne denied that Maurice was the owner of the property described in

Anna's complaint except that he owned a one-half interest in the Blache Film Laboratories.

The judgment, as entered originally, granted Anna a monthly allowance for her separate maintenance. On motion for new trial the superior court struck out the portion of the judgment granting an allowance and the findings in support thereof. The judgment as modified decreed and ordered $6,500 additional fees to one of Anna's attorneys; set aside deeds transferring Maurice's interest in certain real property to Jeanne, and also set aside a transfer by Maurice to Jeanne of stocks and of his joint interest in a bank account of $15,978.26. It was directed that Anna recover from Jeanne the sum of $7,989.13, representing the particular community interest of Maurice and Anna in the bank account, "provided that the amount paid on said judgment shall be paid for the account of Maurice Blache and applied to the payment of any and all amounts due to Anna Blache and her attorneys from Maurice Blache pursuant to the judgments described in the findings herein, and pursuant to the final judgment herein, which amounts are not otherwise or by other means or out of other sources satisfied." The judgment imposed liens on the designated properties and assets to secure the payment of all amounts required by the judgment to be paid. Maurice was enjoined from selling, transferring, encumbering, etc. any of the property, and Jeanne was enjoined from accepting Maurice's interest or any part thereof. The judgment also provided: "On payment or satisfaction of this judgment, plaintiff Anna J. Blache shall have no further claim, right, title or interest in or to or recourse against any of the remaining real or personal property herein or in the complaint referred to or any community property of the plaintiff Anna J. Blache and defendant Maurice J. Blache." Costs of suit were awarded to Anna.

Anna appeals from that part of the judgment allegedly failing (a) to assign to plaintiff one-half of the community property; (b) to determine how or under what circumstances the community property shall be hereafter divided; (c) to make provision protecting the rights of plaintiff to the community property; (d) to award support and maintenance; (e) to decide that Maurice for one year prior to the commence-

ment of the action had wilfully failed to provide for plaintiff. Jeanne appeals from the whole of the judgment.

The evidence shows that Anna and Maurice were married in Ohio in 1912. In the following two years the parties made three attempts to live together, each time separating after quarrels. The final separation took place in Edmonton, Canada, where Maurice was arrested on complaint of Anna. The charges against him were dismissed. According to Maurice's testimony, which the trial court disbelieved, upon the termination of the criminal charges he met Anna outside of the courtroom and there entered into an oral agreement with her settling their property rights. He stated that all of their assets, consisting of a small amount of money and jewelry were turned over to Anna, and that she waived support. Anna could remember no such agreement.

Maurice came to California, where in 1916 he sued for divorce, alleging that Anna had deserted him. Upon being served Anna wrote to Maurice's attorney stating that she would not contest the suit. Her default was entered. When the case came on for hearing the trial judge refused to grant the divorce without further corroboration of Maurice's testimony. The case was continued to allow a deposition to be taken in an eastern state. No further action was taken and the record discloses that the case was dismissed by the court. In the present action, however, the court found that Maurice believed in good faith that his marriage to Anna had been dissolved.

During his service in World War I with the "California Grizzlies" Maurice met Jeanne, and in 1918 married her. Jeanne, unlike Anna, appears to have lived in harmony with him. Anna and Maurice did not keep in touch with each other. Anna toured the country in a trailer with a woman companion and settled in Los Angeles in 1927. In 1932 she visited San Francisco and found the name of Blache in the telephone directory. She telephoned the laboratory but was not able to talk to Maurice. Later in the year she wrote Maurice asking him to send her a copy of the divorce decree which she stated was necessary in order to obtain a passport. At this time it was discovered that the decree of divorce had not been filed. Anna at first assured Maurice that she did not want to cause any trouble and suggested that he secure a divorce and re-

marry Jeanne. Maurice took no steps to straighten out his marital affairs. In 1938 Anna told Maurice that she was destitute and demanded financial assistance. When he failed to help her, she filed the present action for separate maintenance. Not until legal action was threatened did Maurice inform Jeanne of the true situation.

Prior to her marriage Jeanne had owned and operated a rooming house in San Francisco worth from six to eight thousand dollars. Several years later she inherited between two and four thousand dollars. Maurice apparently had no assets at the time of his purported marriage to Jeanne. By 1939, the year in which this action was begun, Maurice and Jeanne owned, as joint tenants, real and personal property worth in excess of $150,000. It is Jeanne's story that at Maurice's suggestion she sold her rooming house and invested the proceeds in a motion picture film laboratory, known as the Blache Film Laboratory, which she operated as her own business. Her testimony as paraphrased in her opening brief is as follows: ''It was understood between them from the beginning that the business and the profits therefrom would be her own separate property. During all of the time that Jeanne Blache managed the business, Maurice was regularly employed on a weekly salary by the Pathe Company.

''About 1930 Jeanne's health became impaired as a result of her overwork in her business and she suffered a breakdown which required a long vacation in an attempt to recover her health. She did not improve and was obliged to give up management of her laboratory business and in 1931 turned the business over to Maurice, who thereupon quit his employment with Pathe and devoted his time to the laboratory business;—for a while, alone, and later in partnership with other persons.

''All the earnings of Maurice were used by him in payment of household expenses, personal expenses and entertainment. While Jeanne managed her laboratory business, and afterward her hotel business, she collected all the moneys and established a bank account in the joint names of herself and Maurice. She did this upon the advice of her banker, after she informed him that she was not in good health, and if anything happened to her, she wanted her husband to have what money or property she possessed, and wished to avoid the expense or delay of probate proceedings or litigation of any kind.

"Later, when Jeanne purchased real estate, she followed the same plan and had the deeds made out in their joint names. This was done under the original understanding with Maurice that Jeanne was to continue to be the owner of the property and that he, whenever requested, would sign any release or transfer to show true ownership in Jeanne. Jeanne testified that in addition to her desire to have Maurice succeed to her property in case of her death, she wanted her husband's name to appear in the business and in the records, as that was the custom among her people and she did not wish to humiliate her husband before their friends." Jeanne's testimony was corroborated by Maurice.

Shortly before Anna began her action, Maurice transferred his interest in the property held in joint tenancy to Jeanne. The trial court ordered these transfers set aside on the ground that they were made to prevent Anna from successfully asserting her rights.

■ The trial judge did not believe Jeanne's story as to why the property was held in joint tenancy. He found that the property was acquired through the joint efforts of Maurice and Jeanne and was held by them jointly. Jeanne's contention that he was not entitled to disbelieve the testimony of herself and Maurice is without merit. The trial court was entitled to take into consideration all of the testimony, such as the fact that the operation of a film laboratory is technical and Maurice, not Jeanne, was experienced in the business. He taught the employees; he negotiated a complicated lease of the premises which were specially built to guard against fire. Maurice filed a statement that he was doing business under the name of "Blache Film Laboratories." In 1938 an income tax return was filed reflecting income as that of the community and allocating one-half to Maurice and one-half to Jeanne. In connection with their operation of the Mayfair Hotel and the Traymore Apartments, both Maurice and Jeanne filed certificates of doing business. When they were sued in the municipal court as a result of a transaction involving the business of the hotel, Jeanne verified an answer expressly alleging that she and Maurice were doing business under the name of "Mayfair Hotel" but in a later suit on the same cause of action, after Jeanne was apprised of Anna's claims, Jeanne took a contrary position and alleged that she alone operated

the hotel. Jeanne's testimony with reference to the $15,978.26 she and Maurice held in a joint bank account may, in the view of the trial court, have cast some doubt on her credibility as a witness. As soon as Jeanne learned that Anna was Maurice's wife she had him sign a withdrawal voucher. She then redeposited the $15,978.26 under the name "Lucille Codo" and sixteen days later withdrew the money. At the trial she testified that she could not recall what she had done with this money.

The accumulations of Maurice and Jeanne, based upon the facts previously set forth, belonged to Maurice and Jeanne in equal shares. There can be no community property in the absence of a valid marriage. In dividing gains made by the joint efforts of a man and woman living together under a voidable marriage, where the parties enter into the relationship in good faith the rule is the same as when a valid marriage is dissolved. (*Schneider* v. *Schneider*, 183 Cal. 335 [191 P. 533, 11 A.L.R. 1386]; *Vallera* v. *Vallera*, 21 Cal.2d 681 [134 P.2d 761]; *Coats* v. *Coats*, 160 Cal. 671 [118 P. 441, 36 L.R.A. N.S. 844].) However, Maurice's share of the property acquired during his association with Jeanne may be the community property of himself and Anna in the absence of evidence that their marital status has been legally dissolved (*Britton* v. *Bryson*, 216 Cal. 362 [14 P.2d 502]) unless Anna waived, abandoned or is estopped to assert her claim to such community interest.

With the factual background in mind, the problem is, what part of the judgment, if any, may be sustained in view of the fact that the trial court awarded a part of the community property to Anna but struck the allowance for separate maintenance from the judgment and deleted the finding of willful neglect.

There is evidence in the record to sustain certain findings if the court believed the testimony of one spouse and disbelieved that of the other. A fair sample is the finding that it is not true that each party agreed to "support or maintain himself or herself." On appeal we cannot evaluate the truth of the testimony from the manner and demeanor of the witnesses. There appear enough contradictory and inconsistent statements in the transcript of the testimony of each of the three principal parties to justify this court in sustaining a

finding contrary to the testimony of any one of the parties. Arguments in the briefs that one party should be believed and not the other will not be considered in detail.

Whatever conclusion the trial court reached in reference to awarding maintenance and support to Anna payable in installments "so long as plaintiff Anna Blache shall live" was set aside on motion for a new trial. However, the award of $7,989.13 to Anna "representing the community interest" of Maurice and Anna in a certain bank account remained as part of the judgment. ▮ In a divorce action the court has power to grant alimony in a lump sum, but if the assets consist of community property then the award must be made in accordance with code provisions. If the action is one for separation and maintenance, a dissolution is not contemplated. The parties remain, as before, husband and wife. The rights of the wife in the community property are not destroyed by the decree for maintenance unless there is an agreed property settlement or the court awards the community property in accordance with the statutes. In a maintenance action, periodical payments, not an absolute allowance, are ordinarily contemplated (*Kusel* v. *Kusel*, 147 Cal. 57 [81 P. 295]), though the court has the right to order otherwise. (Civ. Code, § 137.)

It is proper to resort to community property to enforce orders for separate maintenance. (Civ. Code, §§ 137, 140, 141; *West* v. *West*, 206 Cal. 706 [276 P. 100]; *D'Arcy* v. *D'Arcy*, 89 Cal.App. 86 [264 P. 497].) "Under that section (Civ. Code, sec. 140), or independently, the payment of permanent alimony may be secured by making the same a lien or charge on the obligor's property." (*Reed* v. *Hayward*, 23 Cal.2d 336, 341 [144 P.2d 561].) If the cause of action is for extreme cruelty the court may authorize an award of all of the community property (*Finnegan* v. *Finnegan*, 64 Cal.App.2d 109 [148 P.2d 37]), and the husband's business may be sold and the proceeds used to support the wife and children (*Smith* v. *Smith*, 49 Cal.App.2d 716 [122 P.2d 346]). In the present case no children are involved. Anna took no part in the accumulation of the community property. She seems to have lived without appealing to Maurice for assistance until it was discovered that either he or Jeanne or both owned considerable property. The allowed $7,989.13 represented "the community interest of Maurice . . . and Anna . . . in said bank account."

The record discloses that the court found the value of the real and personal property described to be in excess of one hundred fifty thousand dollars. The findings recite: "In fixing so small an amount of allowance in comparison to the value of the property owned by defendant Maurice J. Blache, the court has taken into consideration the fact that plaintiff Anna J. Blache did not participate in the acquisition of said property." The court made it plain that maintenance payable in installments was not to be allowed. The amount of $7,989.13 is the community interest ordered paid and that "On payment or satisfaction of this judgment, plaintiff Anna J. Blache shall have no further claim, right, title or interest in or to or recourse against any of the remaining real or personal property herein or in the complaint referred to or any community property of the plaintiff Anna J. Blache and defendant Maurice J. Blache."

▮ Under the facts of this case community property may not be disposed of in the foregoing manner in an action for maintenance. Anna's first amended complaint prays for separate maintenance upon the ground of desertion, failure to provide and adultery. The desertion charge is referred to only indirectly in the findings. There are findings that a marriage ceremony was performed between Maurice and Jeanne and that they lived together as man and wife. There is no direct finding that the charge of adultery is true. There is an explicit finding that at the time of the marriage ceremony between Maurice and Jeanne, Maurice believed that a divorce had been procured from Anna. Whatever actuated the trial judge, the findings show that the basis of the judgment is attempted to be placed upon the second cause of action, alleging wilful neglect. It appears that upon that cause of action alone the court distributed the community property and decreed that upon payment Anna should have no further claim or recourse against any of the "community property."

Civil Code section 137 provides that during the pendency of an action for divorce, or when a husband wilfully fails to provide for his wife, she may, without applying for divorce, maintain an action for permanent support and maintenance. The section further provides: " . . . the court may, in its discretion, require the husband or wife, as the case may be, to pay as alimony or as costs of action or as attorney's fees

'any money. necessary for the prosecution of the action and for support and maintenance, and execution may issue therefor in the discretion of the court. The court, in granting the husband or wife permanent support and maintenance of himself or herself . . . shall make the same disposition of the community property . . . as would have been made if the marriage had been dissolved by the decree of a court of competent jurisdiction.''

■ Civil Code section 146 provides: ''In case of the dissolution of the marriage by the decree of a court of competent jurisdiction, the community property, and the homestead, shall be assigned as follows: . . . If the decree be rendered on any other ground than that of adultery, incurable insanity or extreme cruelty, the community property shall be equally divided between the parties.'' Section 137 makes section 146 applicable for separate maintenance. (*Greenlee* v. *Greenlee,* 7 Cal.2d 579 [61 P.2d 1157].) Any division other than as approved by section 146 may not be approved on an appeal. (*Buller* v. *Buller,* 62 Cal.App.2d 687 [145 P.2d 649]; *Tipton* v. *Tipton,* 209 Cal. 443 [288 P. 65]; *Mason* v. *Mason,* 219 Cal. 111 [25 P.2d 461]; *Stewart* v. *Stewart,* 204 Cal. 546 [269 P. 439]; *Lorraine* v. *Lorraine,* 8 Cal.App.2d 687 [48 P.2d 48].) No doubt the trial judge endeavored to reach a practical and perhaps just solution of the difficult problem but, except in the instance designated in the code, community property in either divorce or maintenance actions must be equally divided. (Civ. Code, §§ 137, 146.) Other sections called to our attention do not change this rule.

■ No findings were made upon which an order disposing of the community property in accordance with section 137 of the Civil Code could have been based. There are certain findings on the allegations of desertion and adultery, but Anna realizes the insufficiency of these findings. She takes the position that the evidence clearly permits this court to make a finding of wilful neglect, which would require a judgment awarding separate maintenance and dividing the community property. All of the evidence relevant to the charges of adultery or desertion may be disregarded therefore unless such evidence likewise pertains in some manner to the wilful neglect count. With this position in mind, a number of contentions of appellant Jeanne and respondent Maurice may be dis-

regarded. Maurice did not appeal from the whole or any part of the judgment.

█ There are two sets of facts that may constitute wilful neglect; (a) failure to provide the wife with the common necessaries of life when the husband has the ability to do so, and (b) failure to provide through inability by reason of idleness, profligacy or dissipation. In either of these instances the wife must be destitute of the common necessaries of life. There is evidence that Anna supported herself. If her earnings were sufficient to supply her with the common necessaries of life without assistance from others then she was not destitute and Maurice did not wilfully neglect her.

█ The court did not strike the finding that Anna was destitute, which is inconsistent with its action in striking out the direct finding of wilful neglect. (*Locke* v. *Locke,* 153 Cal. 56 [94 P. 244]; *Rycraft* v. *Rycraft,* 42 Cal. 444; *Washburn* v. *Washburn,* 9 Cal. 475; *Hammond* v. *Hammond,* 92 Cal.App. 212 [267 P. 893].) However, this court cannot resolve the inconsistency by making a finding of ''wilful neglect'' because the record shows that the trial judge was justified in striking the finding on that point. █ If the trial court on motion for new trial determined, upon a reexamination of the record, that the evidence on the part of Anna was not substantial or was not worthy of belief the court had the right to modify the finding. (Code Civ. Proc., § 662; *Spier* v. *Lang,* 4 Cal.2d 711 [53 P.2d 138]; *California Machinery etc. Co.* v. *University City Synd.,* 3 Cal.App.2d 425 [39 P.2d 853]; *Quetin* v. *Caubu,* 58 Cal.App.2d 793 [137 P.2d 880]; *Clarke* v. *Fiedler,* 44 Cal.App.2d 838 [113 P.2d 275]; *Estate of Perkins,* 21 Cal.2d 561 [134 P.2d 231]; 39 Am.Jur., New Trial, pp. 42-43, § 17.)

The following evidence supports the trial court's action in modifying the judgment: Upon learning that Maurice had not secured a divorce Anna wrote: ''While it is true, you should *never* have attempted taking this serious step without knowing *for sure* if you were free to do so but since you have there is only one honorable thing for you to do—when she is well and feels her real good self again, talk this matter over with her sensibly and explain your intention was very good at time, but that the whole thing was such a misunderstanding and you really thought I had obtained the divorce. Then immediately state to her you are willing to go at once and have

your present marriage annulled, get your divorce from *me* and then marry her over again and this it seems to me would be the honorable and the only decent thing to do and the *only* legal way out. So far as I am concerned, I will never in any way cause you trouble regarding this but would rather help you for your wife's sake as it would be unjust to make an innocent person suffer for this mistake.'' A few days later Anna wrote Maurice that she would never cause him trouble, saying: ''I am not that cruel Maurice.''

The first request or demand for money, according to the testimony of Maurice, was on his third visit to Los Angeles to discuss with Anna passport, citizenship and marital difficulties. The record shows the following: ''A. [Maurice Blache] On the first time I saw her, she thought about going East, and she says, 'I would like to see what I can do about having that citizenship paper fixed before I go,' and then two weeks after she asked me to come to see her. Q. Did she say why she wanted you to come to see her. A. Yes, just to see what I had done about the naturalization paper. . . . On the first conversation she said she was going to think matters over and see what was best to do in regard to her and to me, and on that second conversation she said that it would be best just to leave the thing alone and let the thing ride, let me not say anything to Jeanne, leave us as we have been doing before, and I promised her that as quick as Jeanne felt better and she can stand the shock, I will tell her and go and straighten up that mess. I asked her if she was going to stay in Los Angeles, and she say she don't know because she has to go to Palm Springs for some business, it is about four years ago, that conversation, and it wasn't at all—— she never asked me for any money. . . . Q. Give us your best recollection of what Anna said, that you would have to get a divorce sooner or later from her, just what did she say? A. I am trying to get the exact words, was she told me that I will have to get a divorce sooner or later and that as far as she was concerned she wasn't interested only to get her citizenship papers.'' On the third conversation the record shows the following: ''A. [Maurice Blache] I asked her if she was going, when she was going back East, and I asked her if she came back from Palm Springs, she is supposed to spend the winter in Palm Springs, and she says, 'No, I went to Palm Springs because I

had some business to attend to.' I didn't ask her what business she was doing, so she says, 'I don't think I am going to go back East right now, I have to wait for a little while.' We spoke for about one hour or two, over one hour. Then she says to me, just coming from a clear sky, says, 'Maurice I need some money.' Q. She said? A. She said, yes. Q. Was that the first time money had been mentioned in any of the three conversations? A. That is the very first time that the word of money, that she wants some money, that she told me she needs some money. Q. Just what did she say? A. She says, 'Maurice, I want some money, I need some money.' Q. Go ahead. A. This is really the first time she asked me for money since we left, since she left me in Edmonton, Canada, she asked me for some money. . . . I said, 'No, you ask me for money, this is the first time you ask me for some. What do you need, how much do you want? What is it all about? You told me you were not exactly well off, but you were getting along very nicely. This is the first time you told me, you talked about asking some money. How much do you want? What is it all about?' She says, 'Well, I owe $3,000.' Q. She owed? A. Yes, she owed $3,000, that she would like to pay, and she says, 'My car is getting kind of shabby now and I would like to buy a new one.' I said, 'Well, how much do you want? What kind of car do you want?' 'Oh,' she said, 'I would like to get a $2,000 car, a Cadillac.' I said, 'Well, Anna, I have a Buick and my Buick I got it for five or six years.' Q. What else was said now at that time about money, either by the lady or by you? A. Well, I told her that I didn't have any money and that it was absolutely impossible for me to give her $5,000.'' The record discloses, according to Maurice, that he did not inform Jeanne of his previous marriage to Anna until an offer to settle Anna's claim in full upon a payment of $37,500 had been made. The offer was refused and this proceeding instituted one month later.

Maintenance should be granted only when necessary and reasonable. In the middle of the trial Anna returned to her home in Los Angeles. With some difficulty her presence was obtained during the further proceedings. During the interim the court on a motion for continuance expressed itself as follows: ''Of course, I do not overlook the fact that her marriage to Mr. Blache is still in existence—and it evidently is from

the testimony heard so far, that she might be entitled to some moderate relief possibly. Under the circumstances it could not be very much. In any event, she has subsisted for almost twenty-five years without receiving any support from Mr. Blache or from anybody else apparently except this lady friend." The evidence shows that upon several visits to San Francisco from her home in Los Angeles she stopped at one of the best hotels. She owned two lots some fifty miles from Palm Springs of unknown value. In a deposition taken prior to the trial the following appears: "Q. Have you [Anna] any property? A. I have only a car and a trailer." The evidence shows that she had been a cashier in a restaurant, a chauffeur, a bookkeeper, a traveling companion to a woman friend and a seller of "art objects."

The action of the court in striking out the finding of "wilful neglect," coupled with the insertion of the provision giving Anna less than one-half of the community property, and the evidence in the case, make it necessary to reverse the judgment. Whether the factual questions on a new trial should be submitted on the same record, or whether new or additional evidence should be presented, is a question to be decided by the trial court and the respective attorneys.

In view of the conclusions reached herein it does not seem necessary to consider further questions raised by appellant Jeanne. Whether the property described in the complaint was the separate property of Jeanne is a question of fact which may be tested again on a retrial. Referring to Jeanne, the trial judge expressed the thought "The real victim is this lady sitting down there. . . . She was innocent, she has found herself in this situation through her marriage to Mr. Blache."

The appeal by Anna is based primarily upon "The failure of said Superior Court to award to plaintiff support and maintenance, and the part of said judgment which fails so to do. . . . The failure of said Superior Court to decide that defendant Maurice J. Blache had for more than one year prior to the commencement of this action wilfully failed to provide for plaintiff, and the part of said judgment which fails so to do."

"The failure of said Superior Court to make appropriate provision in said judgment protecting the rights of plaintiff to said community property, and the part of said judgment which

fails so to do.'' These questions have been sufficiently commented upon.

Maurice as a respondent on appeal contends that Anna abandoned him; that the failure to answer the complaint for divorce filed in Los Angeles County some years ago, and the entry of the default, constitute a bar to the present action, and that the element of fraud in the transfer of property from Maurice to Jeanne is a false quantity in the case.

 Whether Maurice deserted Anna or vice versa is entirely a question of fact. The same statement may be made in reference to letters subsequently written by Anna to Maurice.

 There was a default in the original proceeding but no judgment of divorce entered. A default judgment, if a court has jurisdiction, is a waiver of one's right to subsequently litigate the adjudicated issues (*Horton* v. *Horton,* 18 Cal.2d 579 [116 P.2d 605]), but the "issues" in the present case were not previously adjudicated. (*Paduveris* v. *Paris,* 213 Cal. 169 [1 P.2d 986]; *Brown* v. *Brown,* 170 Cal. 8 [147 P. 1171]; *Maxwell* v. *Maxwell,* 66 Cal.App.2d 549 [152 P.2d 530]; *Green* v. *Green,* 66 Cal.App.2d 50 [151 P.2d 679].)

 The question of fraud is not a false quantity in this case though the finding thereon appears inadequate, but this defect may be rectified on a retrial if the court finds that there was fraud in the transfer of property.

 The judgment purports to protect the award of attorney fees by providing that the payment of $7,989.13 "representing the community interest" of Maurice and Anna in a bank account shall be applied to the payment "of any and all amounts due to Anna Blache and her attorneys." This appears to be the only reference specifying that community property shall be held as security for attorney fees. The award of the community property may not stand for the reasons heretofore stated. It follows that if the community property award may not be held as security for the payment of the community interest, it may not be held as security for the payment of the attorney's fee in the absence of a direct order to that effect. In other words the judgment, stripped of the provisions of the community award, leaves the following provision protecting the attorney's fees: "There are hereby created and imposed on the interest of Maurice Blache in the properties and assets hereinabove described liens securing the

payment of any and all sums required to be paid by the judgments heretofore made herein and described in the findings herein, and also by this judgment, and also any amounts which may be allowed or awarded to plaintiff or her attorneys by orders which may hereafter be made.'' Considering the substantial nature of Maurice's assets, it appears that the award of attorney fees is sufficiently protected.

The judgment insofar as it refers to attorney fees and all provisions of said judgment protective of those fees are affirmed; the portions of the judgment adjudicating Maurice's ownership of one-half of the real and personal property, and vacating and setting aside certain transfers of his interests in such properties to Jeanne, insofar as such transfers affect his one-half interest, and the provisions of the judgment granting an injunction against Maurice until the rights of the parties can be determined, are also affirmed; in other respects the judgment is reversed, and the cause remanded for a new trial in accordance with the views herein expressed. Costs shall be entered as follows: On the appeal from the whole of the judgment, Jeanne may recover against Anna and Maurice; on the appeal by Anna from part of the judgment, costs may be recovered from Maurice.

Peters, P. J., and Dooling, J. pro tem., concurred.

A petition for a rehearing was denied July 21, 1945, and the opinion and judgment were modified to read as above.

A second petition for a rehearing was denied August 18, 1945, and defendant and appellant's petition for a hearing by the Supreme Court was denied September 17, 1945. Carter, J., and Schauer, J., voted for a hearing.